IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHRISTOPHER JAMES MICHELOTTI, | Cause No. CV 20-188-BLG-SPW |
| Petitioner, | ORDER |
| vs. | |
| ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

Petitioner Christopher James Michelotti, a state prisoner proceeding pro se, filed a petition and supplement in support seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. *See* (Docs. 1 & 1-1.)  Michelotti raised five claims in his petition.  Following a review of the state court documents, the Court directed Michelotti to show cause as to why Claims 2, 3, and a portion of Claim 1 should not be dismissed as procedurally defaulted.  (Doc. 15.)  Michelotti responded to the Court's order.  (Doc. 19.)

## I.     Factual Background

The following factual background, presumed to be correct under 28 U.S.C. §2254(e)(1), is taken from the Montana Supreme Court's decision affirming

Michelotti's convictions.  Additional facts and context will be supplied herein

where necessary:

> In the early evening of May 11, 2014, Valerio Resendiz (Valerio),
> Valerio's friend, Garrick Gonzales (Gonzales), and Valerio's
> girlfriend, Sabre Dillon (Dillon), drove to Daniel Lira's (Lira) house in
> Billings, Montana. Dillon remained in the vehicle while Valerio and
> Gonzales stepped inside. Inside Lira's house, Valerio and Gonzales
> saw Lira and met Michelotti for the first time. During their encounter,
> Michelotti held a black semiautomatic handgun and Valerio saw drugs
> and other guns inside Lira's house. As a result, Valerio felt
> "uncomfortable." Michelotti told Valerio that he was in a gang, the
> Sureños, and Valerio told Michelotti that he used to be a Sureño. This
> prompted Michelotti to ask Valerio why his head was not shaven and
> suggested Valerio "put in work" with Michelotti, which Valerio
> understood to mean Michelotti wanted his help committing crimes.
> Valerio explained to Michelotti that he and his girlfriend recently had
> a child and that he no longer commits crimes. Valerio believed
> Michelotti was high on methamphetamine based on Michelotti's
> behavior and Valerio's experience being around other users. Valerio
> and Gonzales stayed at Lira's house for about five minutes.
>
> After leaving, Valerio, Gonzales, and Dillon went to Valerio's parents'
> house, where Valerio, Dillon, and their five-month-old child lived and
> where Gonzales was a frequent overnight guest. Valerio's parents,
> Carla Resendiz (Carla) and Adan Resendiz (Adan), were at home with
> Valerio and Dillon's child. Valerio told his parents about their
> interaction at Lira's house and about meeting a man who made him
> uncomfortable because he held a gun. Between nine and ten o'clock
> that evening, Carla and Adan went downstairs to their basement
> bedroom for the night. Valerio, Gonzales, and Dillon remained in the
> upstairs living room watching television while Valerio and Dillon's
> child slept in her portable crib in the adjoining dining room.
>
> At approximately eleven o'clock that evening, Michelotti knocked on
> Valerio's parents' front door. Valerio looked at his home security
> system's monitor, which conveyed real-time video from six exterior
> cameras. Valerio installed the camera system several years earlier in
> response to thefts and damages of vehicles on the premises. Valerio

did not recognize that it was Michelotti at the front door because of the camera system's poor image quality. Valerio opened the door and Michelotti stepped inside uninvited. Michelotti again urged Valerio to "put in work," or go commit crimes, with him. Valerio told Michelotti that he had a family and that he would not commit crimes with him. Michelotti became "upset," pulled the handgun that Valerio saw him holding earlier, and pointed it at Valerio. Dillon, who was holding her recently awoken child, told Michelotti to leave and Michelotti then pointed the gun at Dillon and her child. Dillon surreptitiously picked up a cordless phone and went downstairs to the basement. In the basement, Dillon woke Carla and Adan up and initiated a 9-1-1 call, which lasted over fifteen minutes.

Upstairs, Valerio agreed to go with Michelotti and they, along with Gonzales, stepped outside onto the porch. Valerio quickly returned inside, telling Michelotti he was going to get some shoes and clothes to wear. Valerio left the front door unlocked because Gonzales was still outside. Instead of getting shoes and clothes, Valerio went to his basement bedroom and retrieved a twelve-gauge shotgun from under his bed. Valerio attempted to go back upstairs with the shotgun, but Adan stopped him and took the shotgun from Valerio's hands. Carla, speaking on the phone with a 9-1-1 dispatcher, handed the phone to Valerio, who was both more calm and better informed, so that Valerio could provide the dispatcher additional information about what was happening. At some point, Gonzales, Michelotti, and Lira, who apparently arrived with Michelotti, entered the house. Gonzales joined the others downstairs in the basement, while Michelotti stood at the top of the stairs. Adan warned Michelotti that he held a gun and not to come downstairs. Michelotti moved toward the stairs and Adan shot him in one of his knees with the shotgun. In response, Michelotti shot three rounds from his gun down the stairwell, injuring no one.

Shortly thereafter, police officers positioned outside the front of the house arrested Lira and Michelotti, who crawled out of the house because of his injured knee. At around the same time, police officers positioned outside the back of the house helped everyone else (Valerio, Gonzales, Dillon, Adan, Carla, and Valerio and Dillon's child) out of a basement window after Gonzales kicked the window's glass out. Upon searching Michelotti, officers removed a Bic-type shaving razor from his pocket. Michelotti received medical treatment

for his injured knee.

The State charged Michelotti with one count of aggravated burglary or, alternatively, assault with a weapon against Valerio, and four additional counts of assault with a weapon against Gonzales, Dillon, Adan, and Carla. The District Court held a jury trial. At trial, Michelotti renewed his pre-trial objection to the admission of gang-affiliation evidence, arguing it would unfairly prejudice the jury. Michelotti also moved for a mistrial after one of the State's witnesses testified that Michelotti had an outstanding arrest warrant when he committed the offenses. The jury convicted Michelotti of aggravated burglary and four counts of assault with a weapon. The District Court imposed a sentence of forty years for aggravated burglary and four twenty-year sentences for each assault with a weapon, to run concurrent with each other, but consecutive to the aggravated burglary sentence.

*State v. Michelotti*, 2018 MT 158, ¶¶ 2-7, 420 P.3d 1020, 1022–24 (Mont. 2018).

## II.   **Defaulted Claims**

Generally, federal courts will not hear defaulted claims unless the petitioner can demonstrate cause for his noncompliance and actual prejudice or establish that a miscarriage of justice would result from the lack of review. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995); see also, *McKinney v. Ryan*, 730 F.3d 903, 913 (9th Cir. 2013). But this Court is empowered to bypass a procedural default issue in the interest of judicial economy when the claim clearly fails on the merits. *See Flournoy v. Small*, 681 F. 3d 1000, 1004 n. 1 (9th Cir. 2012); see also, *Franklin v. Johnson*, 290 F. 3d 1223, 1232 (9th Cir. 2001); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that, in the interest of judicial economy, courts may proceed to the merits, in the face of procedural default issues).

4

Based upon Michelotti's response, at this juncture it is more efficient to address the merits of Michelotti's defaulted claims.

###### i.    GSR/*Brady* claims

In Claim 2, Michelotti alleges a *Brady* violation occurred in violation of the Fifth and Fourteenth Amendments when the State withheld the results of Adan's gunshot residue evidence (GSR) results.  (Doc. 1 at 5); *see also* (Doc. 1-1 at 8-10, 36-45).  In a similar vein, Michelotti alleges the State committed prosecutorial misconduct in violation of the due process and equal protection clauses as a result of the *Brady* violation. (Doc. 1 at 9); *see also* (Doc. 1-1 at 9-10).

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Court held that "suppression by the prosecution of evidence favorable to an accused…violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." Under *Brady*, prosecutors are responsible for disclosing "evidence that is both favorable to the accused and material either to guilt or punishment."  *United States v. Bagley*, 473 U.S. 667, 674 (1985)(internal quotation marks omitted).  The failure to turn over such evidence violates due process.  *Wearry v. Cain*, 577 U.S. 385, 392 (2016)(per curiam).  The prosecutor's duty to disclose material evidence favorable to the defense "is applicable even though there has been no request by the accused, and encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527

U.S. 263, 280 (1999).

"There are three components to a true *Brady* violation: '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Benson v. Chappell*, 958 F. 3d 801, 831 (9th Cir. 2020)(*quoting Strickler*, 527 U.S. at 281-82.) "The terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases." *Benn v. Lambert*, 283 F. 3d 1040, 1053 n. 9 (9th Cir. 2002). Failure to disclose evidence by the prosecution is prejudicial "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "reasonable probability" of a different result exists when the failure to disclose "undermines confidence in the outcome of the trial." *Id.* at 678.

In the instant case, there was no *Brady* violation. As an initial matter, there was no suppression. While a GSR swab was taken from Adan, it was never sent away for testing. This decision was made, because "it would not have revealed much." *See* Aff. Siegman, (Doc. 12-13 at 7); *see also* Testimony of Det. Tucker (Doc. 12-3 at 192:13-15)("And in looking back on it, actually it was kind of pointless to even do a GSR test on Adan because he admitted to firing the gun, so that is not in question."). Adan's admission to firing the shotgun meant that this

6

fact was not in controversy. Further, the 911 call was played for the jury. During that call Valerio stated that his father was about to shoot the intruder, the shot could be heard, and the contemporaneous exclamations of others in the basement were heard following the shot. Accordingly, there were no GSR results necessary to determine who fired the weapon. (Doc. 12-13 at 8.) That is, such a test would not have been probative of determining whether or not Adan fired the shotgun; there was sufficient evidence, including Adan's own admission, that he did so. Further, because no tests were ever completed, there was nothing for the State to suppress.

Even if such a test been performed, there is no reason to suppose the results would have been favorable to Michelotti- either because they were exculpatory to Michelotti or impeaching of the State's witnesses. As set forth above, there was no genuine dispute about who fired the shotgun. Adan admitted he did and several other of the State's witnesses corroborated his testimony. Further, given the amount of evidence that was presented implicating Michelotti, there is no reason to believe that GSR test results would have had an impact on the jury's verdict. There was no *Brady* violation in the present case. Because no violation occurred, Michelotti cannot prove that the prosecution committed prosecutorial misconduct or that an ensuring constitutional violation resulted. This claim will be denied.

//

7

### ii.    Conflict of Interest Claim

Michelotti alleges Siegman provided ineffective assistance of counsel due to

a conflict of interest stemming from the Office of the Public Defender engaging in

dual representation of Michelotti and co-defendant Danny Lira. *See e.g.* (Doc. 1-1

at 23.) It is true that under Rule 1.7 of the Montana Rules of Professional Conduct,

a lawyer shall not represent a client if the representation involves a concurrent

conflict of interest. A concurrent conflict of interest is defined as: (1) the

representation of one client will be directly adverse to another client; (2) there is a

significant risk that the representation of one or more clients will be materially

limited by the lawyer's responsibilities to another client, a former client or a third

person or by a personal interest of the lawyer. *See* Rule 1.7(a). Notwithstanding the

existence of a concurrent conflict of interest, a lawyer may represent a client if

certain circumstances are present. *See* Rule 1.7(b).

But this Court need not examine the pertinent exceptions, because there was

no conflict of interest. While Lira may have initially been detained, the State of

Montana apparently did not file criminal charges against Lira in the district court.

*See* Aff. Siegman, (Doc. 12-13 at 4.) Accordingly, Michelotti is mistaken in his

assertion that there was a conflict resulting from dual representation. No such

conflict existed. This claim, too, will be denied.

//

8

### III.   Claims Addressed under 28 U.S.C. § 2254(d)

The Montana Supreme Court addressed the merits of Claims 4 and 5 on direct appeal.  Additionally, in postconviction review, the Montana Supreme Court affirmed the denial of the bulk of Claim 1, alleging ineffective assistance of trial counsel.  Accordingly, this Court's consideration of those claims is constrained by the deferential standard of review set forth at 28 U.S.C. § 2254(d).

A federal court may entertain a habeas petition from a state prisoner "only on the ground that [he] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  *Id.* § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000).  Additionally, a federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The U.S. Supreme Court further instructs that § 2254(d)(1) consists of two

separate clauses. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached [by the U.S. Supreme Court] on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. The question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Thus, AEDPA sets forth a highly deferential standard for evaluating state court decisions. A state prisoner is required to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Bearing these principles in mind and the limited scope of review outlined by

10

AEDPA, the Court turns to the remainder of Michelotti's claims.

### i. Ineffective Assistance of Counsel (IAC)

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

To obtain relief on a claim of ineffective assistance of counsel, a defendant must show both that his attorney provided deficient performance, and that prejudice ensued as a result. *Strickland*, 466 U.S. at 687-96. To establish deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance. *Id.* at 689. Thus, in evaluating allegations of deficient performance the reviewing court's scrutiny of counsel's actions or omissions is highly deferential. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

11

time." *Id.* The defendant's burden is to show that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment. *Id.* at 687.

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In addition, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard…A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101.  Accordingly, the federal court must engage in "a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, 571 U.S. 12, 15 (2013)."

In the instant case, Michelotti claims trial counsel provided ineffective assistance in violation of the Sixth Amendment based upon trial counsel's failure to: perform an adequate investigation and obtain the results of GSR testing and

have the weapons finger-printed; identify a conflict of interest due to counsel's own prior experience with a home invasion; acknowledge that the Office of the Public Defender was overloaded with cases; recall Valerio for impeachment purposes; and, realize that Michelotti was facing an assault with a weapon against Gonzales. *See e.g.* (Doc. 1 at 4); *see also*, (Doc. 1-1 at 3-7, 20-32, 33-35).

As set forth in a prior order of this Court, *see e.g.* (Doc. 15 at 3-4), the Montana Supreme Court determined Michelotti's IAC claims were inadequate. Applying the *Strickland* test, the Court held Michelotti did not establish that Siegman performed deficiently, rather he posited claims which, when analyzed individually, involved decisions that were either within Siegman's discretion as trial counsel or Michelotti presented facts outside of Siegman's control. *Michelotti*, 2020 MT 269N at ⁋ 13. The Court relied upon Siegman's affidavit and reasoning explaining the decisions he made relative to his representation of Michelotti. *Id.* Siegman also explained that the home invasion which he experienced took place over 25 years prior and was significantly different and less serious than that involved in Michelotti's case. *Id.* In short, the Court found Michelotti failed to establish the first *Strickland* prong of deficient performance. *Id.*

The Montana Supreme Court reasonably applied *Strickland*. Siegman explained the differences in Michelotti's underlying case and the home invasion

13

which he experienced- not only did the two events occur over 25 years apart, but they were factually very dissimilar. (Doc. 12-13 at 2-3.)  Siegman referenced his own experience as a rhetorical tactic to engage the jury and encourage them to set aside any biases they may have had in order to arrive at a fair verdict.  (*Id.* at 3.) Siegman further explained that he was well aware that Gonzales was one of the alleged victims of Michelotti's assault and prepared a jury instruction and special verdict form referencing Gonzales, contrary to Michelotti's assertions.  (*Id.* at 6.) In these respects, Siegman's performance was objectively reasonable.  *Strickland*, 466 U.S. at 688.

Similarly, Siegman explained there was a solid basis for his decision not to recall Valerio as a defense witness.  Siegman viewed his direct exam testimony and cross-examination as compelling and incriminating to Michelotti.  He did not want to provide Valerio with another opportunity to repeat his testimony to the jury and felt that doing so could be damaging to the defense.  (Doc. 12-13 at 7.) Siegman also explained, as discussed above, that the GSR results would not have revealed much and the real-time evidence of the 911 call and the contemporaneous witnesses exclamations, coupled with Adan's admissions, were more probative of what had transpired.  (*Id.* at 7-8.)

Finally, there is no indication in the record before this Court that Siegman was overloaded and unable to proficiently represent Michelotti.  Siegman

14

explained he prepared extensively for trial, visited with Michelotti "at least 26 times" between January 22, 2015 and February 17, 2016, engaged the services of an investigator to conduct interviews, and enlisted the assistance of co-counsel Gabriel Valentine to assist with the jury trial. (*Id.* at 3-4.) In short, Michelotti has failed to establish that Siegman's representation fell below an objective standard of reasonableness. Because he fails to satisfy the first prong of *Strickland*, this Court need not consider the question of prejudice. *See Strickland*, 466 U.S. at 697. The Montana Supreme Court reasonably decided this claim and under AEDPA, this Court must afford deference. The claim will be denied.

### ii.     Admission of bad acts evidence under Rules 404(b) and 403

Federal habeas relief is not available for alleged error in the interpretation or application of state law. *Estelle*, 502 U.S. at 67-68; *Park v. California*, 202 F. 3d 1146, 1149 (9th Cir. 2000). Accordingly, "evidentiary rulings based on state law cannot form an independent basis for habeas relief." *Rhoades v. Henry*, 638 F. 3d 1027, 1034 n. 5 (9th Cir. 2011). The Supreme Court has acknowledged a "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). Thus, to the extent that Michelotti claims the state courts erred in their application of the Montana rules of evidence, such a claim is not cognizable in federal habeas.

A state court's evidentiary ruling, even if erroneous, is grounds for federal

habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Estelle*, 502 U.S. 68-70; see also, *Dillard v. Roe*, 244 F. 3d 758, 766 (9th Cir. 2001). Habeas relief is thus only available if an evidentiary ruling was arbitrary, disproportionate to the end it was asserted to promote, or so prejudicial that it rendered the trial fundamentally unfair. See, *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Walters v. Maass*, 45 F. 3d 1355, 1357 (9th Cir. 1995).

Thus, if a state trial court erred in admitting evidence and that error violated a petitioner's rights under the United States Constitution, in order to be entitled to federal habeas relief, a petitioner must still show that the error "had a substantial and injurious effect or influence in determining the jury's verdict" and that he suffered actual prejudice, that is, a "reasonable probability" that the jury would have reached a different result but for the error. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). Michelotti has not made such a showing.

### a. Gang affiliation testimony

Michelotti cites to the Federal Rules of Evidence and argues that the state courts erred by allowing evidence of his gang affiliation under Rule 403. While the evidence allowed the State to construct a more cohesive narrative of the events leading up to the home invasion and subsequent shooting, Michelotti asserts the

danger of unfair prejudice outweighed the probative value of such information because of the risk that the jury would convict based upon a fear of gangs. *See e.g.* (Doc. 1-1 at 46-52.)  As a preliminary matter, the Court notes that the underlying decision of the Montana Supreme Court denying Michelotti relief relied entirely on state, and not federal, law.

Prior to trial, the defense moved to exclude evidence of Michelotti's "other crimes, prior bad acts or wrongs" to include illegal associations.  In response, the State argued that evidence of Michelotti's affiliation with the Sureño gang was admissible under the transaction rule, because Michelotti committed the crimes, in part, as an attempt to force Valerio to participate in gang activities with him. Specifically, the State argued that Michelotti questioned Valerio about gang affiliation, described his own membership as a Sureño and demanded at gun point that Valerio participate in gang activity and, thus, provided context of the actual circumstances of the crime. *See State v. Michelotti*, 2018 MT 158, ¶ 12.  The trial court denied Michelotti's motion in part, and concluding that evidence was admissible under the Transaction Rule[1] because, "it adds context for [Michelotti] being at the residence with a weapon and the basis for fear or apprehension of the individuals inside." *Id.*

---

[1] The Transaction Rule provides, "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." *See* Mont. Code Ann. § 26-1-103.

On appeal, the Court found that evidence of Michelotti's gang affiliation was central to the jury's understanding of what transpired, and therefore, highly probative. *Id.* at ¶ 14. In explaining how this information was inextricably linked and explanatory to the charges against Michelotti, the Court explained:

> Michelotti met Valerio hours before the alleged assaults and the two discussed their gang affiliations. Michelotti said that he was in the Sureños and Valerio said he used to be in the Sureños too. Michelotti asked Valerio why, if he was a Sureño, his head was not shaven. He suggested Valerio "put in work" with him, which Valerio understood to mean that Michelotti wanted Valerio's help committing crimes because of Valerio's former gang affiliation. Later, Michelotti came to Valerio's parents' house, where Valerio lived, to renew his earlier urging that Valerio help him commit crimes. Michelotti brought a shaving razor with him for this encounter.

*Id.*

This evidence explained and was probative of Michelotti's conduct during his encounters with Valerio and assisted the jury in understanding the relationship between Michelotti and Valerio. It also was probative of why Michelotti, after just meeting Valerio, showed up uninvited to Valerio's home with a gun. *Id.* The purported Sureño affiliation between the two provided context for Michelotti's actions on the night in question. Moreover, this information assisted the jury in understanding why a reasonable person would have apprehension or fear of Michelotti under the given circumstances. *Id.* at ¶ 15. Accordingly, it was within the trial court's discretion to decide whether the danger of unfair prejudice associated with such testimony outweighed the probative value. *Id.* at ¶ 16. The

18

Montana Supreme Court found the testimony to be highly probative and the value

of such evidence not to be substantially outweighed by the potential prejudice. *Id.*

The Montana Supreme Court found that the trial court properly conducted

the weighing process recognized under the state evidentiary rules and that the

evidence of Michelotti's gang affiliation was properly admitted. This Court must

defer to the state court's determination of state law. *Wainwright v. Goode*, 464

U.S. 78, 84 (1983). Montana state law was not violated by the admission of this

evidence. As set forth above, Michelotti cannot assert an error of state law before

this Court, such a claim is not cognizable.   Or, put another way, this Court cannot

grant relief on a basis of a belief that the state trial court incorrectly interpreted the

state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*,

502 U.S. 62, 72 (1991)(*citing Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

Moreover, Michelotti has not shown that the admission of this evidence

violated federal due process. The United States Supreme Court has "defined the

category of infractions that violate 'fundamental fairness' very narrowly."

*Dowling v. United States*, 493 U.S. 342, 352 (199), and "has made very few rulings

regarding the admission of evidence as a violation of due process." *Holley v.*

*Yarborough*, 568 F. 3d 1091, 1101 (9th Cir. 2009). It has opted not to hold that

evidence of other crimes or bad acts "so infused the trial with unfairness as to deny

due process of law." *Estelle*, 502 U.S. at 75 & n. 5 (noting that the Court

19

"express[ed] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes" evidence to show propensity to commit a charged crime"). Moreover, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F. 3d at 1101 (*citing Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Thus, in the absence of clearly established law, this Court cannot conclude the state court's ruling constituted an "unreasonable application" for purposes of AEDPA. *See e.g. Larson v. Palmateer*, 515 F. 3d 1057, 1066 (9th Cir. 2008). This claim will be denied.

### b. Testimony regarding outstanding warrant

Michelotti claims that the lower court erred in denying his motion for a mistrial after the State violated an order of the court and introduced testimony that there was a warrant for his arrest. (Doc. 1-1 at 53-56.) Michelotti primarily relies upon state law to support his argument. (*Id.*)

During trial Sergeant Shane Winden testified that while Michelotti was receiving medical treatment for his knee injury, he learned that there was an active warrant for Michelotti's arrest. *See. Michelotti*, 2018 MT 158, ¶ 19. Defense counsel objected under Rules 403 and 404 and moved for a mistrial. Outside of the presence of the jury the trial court denied Michelotti's motion and ruled that

although the information was somewhat prejudicial, it did not rise to the level of a witness mentioning a prior conviction, prior incarceration, or the defendant being on probation. *Id.* The court sustained the objection, prohibited the State from further discussion of the outstanding warrant, and gave the jury a curative instruction in which it admonished them to disregard the officer's testimony. *Id.* At the conclusion of the case, the trial court gave an instruction to the jury not to convict Michelotti of the offense charged based upon any of his prior bad acts. *Id.* The Montana Supreme Court considered the trial court's ruling and determined, based upon the "strong evidence against Michelotti, and the steps the lower court took to cure the "somewhat prejudicial statement," that there was no reasonable possibility that the inadmissible evidence contributed to Michelotti's conviction. *Id.* at ₱ 24.

For the same reasons explained above, to the extent that Michelotti challenges the trial court's denial of his motion for a mistrial under state law, this Court is bound by the Montana Supreme Court's reasonable determination, applying state law, that the trial court did not abuse its discretion. *See Waddington v. Sarausad*, 555 U.S. 179, 192 n. 5 (2009)("we have repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the

21

challenged conviction, binds a federal court sitting in habeas corpus")(additional citations omitted).

Moreover, as discussed above, Michelotti has not shown that this unprompted comment so infected the trial with unfairness as to make his resulting conviction a denial of due process. The trial court took reasonable steps to cure the prejudice and instructed the jury accordingly. Any error from the stricken evidence was harmless given the overwhelming evidence of Michelotti's guilt and the trial court's limiting instruction. *See e.g. Mancuso v. Olivarez*, 292 F. 3d 939, 952 (9th Cir. 2002)(finding any prejudice from detective's reference to "parole search" was "satisfactorily ameliorated" by curative instruction given)(overruled on other grounds by *Slack v. McDaniel*, 529 U.S. 473 (2000); *Flowers v. Foulk*, 774 Fed. Appx. at 1022 (finding admission of improper testimony about defendant's parole status harmless error that did not render trial fundamentally unfair in light of curative instruction given to the jury, the fact that no additional details were elicited, and the strong evidence of defendant's guilt). The statement regarding the warrant did not render Michelotti's trial fundamentally unfair. Accordingly, this claim will also be denied.

### iii.  Insufficient evidence re: victim Garrick Gonzales

Michelotti claims the state presented insufficient evidence to prove that Gonzales was in fear/reasonable apprehension of serious bodily injury from a

22

weapon, because he did not testify at trial. *See* (Doc. 1-1 at 14-16).   The Montana

Supreme Court noted that a criminal conviction may be obtained on entirely

circumstantial evidence and that a person's reasonable apprehension of serious

bodily injury is an objective standard. *Michelotti*, 2018 MT 158, ⁋ 27.  The Court

noted that although Gonzales did not testify, the State presented the following

evidence to the jury:

> Gonzales was with Valerio when the went to Lira's house and met
> Michelotti; Michelotti held a black semiautomatic handgun, discussed his
> gang affiliation, described engaging in future criminal activity and acted like
> he was high on methamphetamine; Gonzales was inside Valerio's family
> home later that night when Michelotti knocked and entered uninvited;
> Gonzales was in the room when Michelotti pointed a gun at Valerio and
> Dillon; Gonzales initially exited the home with Valerio and Michelotti and
> then returned to join the others downstairs; Valerio was fearful for those
> downstairs, including Gonzales; Adan shot Michelotti in the knee when
> Michelotti proceeded toward the stairwell; Gonzales was downstairs when
> Michelotti fired several rounds down the stairwell towards Gonzales'
> location; Gonzales exited the home with the others after he kicked out a
> window to facilitate their exit; Valerio testified he was "scared for his life;"
> and Valerio testified Gonzales was also scared.

*Id.* at ⁋ 28.  The Court concluded based upon this evidence, that a reasonable

person in Gonzales' circumstances would feel apprehension and that a reasonable

trier of fact could have found that the essential elements of assault with a weapon,

based upon Gonzales' experience, were met beyond a reasonable doubt. *Id.* at ⁋

29.

On habeas corpus, the court's inquiry into the sufficiency of evidence is

limited in that it is subject to two layers of judicial deference. *Coleman v. Johnson*,
566 U.S. 650, 651 (2012) (per curiam). On direct appeal, "it is the responsibility of
the jury – not the court – to decide what conclusions should be drawn from
evidence admitted at trial. A reviewing court may set aside the jury's verdict on the
ground of insufficient evidence only if no rational trier of fact could have agreed
with the jury." *Id.* (*quoting Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam));
*see Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (standard of review on
sufficiency of the evidence claim is whether, "after viewing the evidence in the
light most favorable to the prosecution, *any* rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt") (emphasis in
original). "[T]he only question under *Jackson* is whether [the jury's] finding was so
insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S.
at 656.

Second, on habeas review, "a federal court may not overturn a state court
decision rejecting a sufficiency of the evidence challenge simply because the
federal court disagrees with the state court. The federal court instead may do so
only if the state court decision was 'objectively unreasonable.' " *Coleman*, 566
U.S. at 651, 656 (citations omitted); *see Juan H. v. Allen,* 408 F.3d 1262, 1274-75
(9th Cir. 2005) (as amended) (on federal habeas review, relief may be afforded on
sufficiency of the evidence claim only if the state court unreasonably applied

24

*Jackson* to the facts of the case), cert. denied, 546 U.S. 1137 (2006).Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n.16. The testimony of a single witness is sufficient to sustain a conviction. *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004) (per curiam). Circumstantial evidence and the inferences drawn therefrom also may be sufficient to sustain a conviction. *Ngo v. Guirbino*, 651 F.3d 1112, 1114-15 (9th Cir. 2011) (citations omitted).

In its decision, the Montana Supreme Court set forth the testimony presented which supported the jury's finding that Michelotti committed assault with a weapon against Gonzales.  This decision was objectively reasonable and Michelotti has failed to show that the state court unreasonably applied federal law.  Based upon this Court's independent review of the record, a reasonable jury could have concluded that Gonzales was in reasonable apprehension of serious bodily injury and, therefore, that Michelotti committed an assault with a weapon against him.  Or, put another way, this Court cannot find that the Montana Supreme Court's findings constitute or are based on unreasonable determinations of the facts or that its analysis is objectively unreasonable.  Accordingly, this Court will afford deference under AEDPA.

## IV.   Conclusion

Michelotti's petition will be denied.  Aside from being procedurally

defaulted, his claims challenging the GSR testing and alleging *Brady* violations lack merit, as does his conflict of counsel claim. The remaining claims do not survive deferential review under AEDPA. The petition will be denied in its entirety.

## V.   Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules governing § 2254 Proceedings. A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Michelotti has not made a substantial showing that he was deprived of a constitutional right. Accordingly, this Court must afford deference to the Montana Supreme Court's resolution of the majority of his claims. As set forth above, the remaining claims are procedurally defaulted and lack merit. There are no close questions and there is no reason to encourage further proceedings in this Court. A certificate of appealability is denied.

Based on the foregoing, the Court enters the following:

## ORDER

1.  The Petition (Doc. 1) is DENIED.

2.  The Clerk of Court is directed to enter by separate document a judgment in favor of Respondent and against Petitioner.

3. A certificate of appealability is DENIED.

DATED this 16th day of May, 2023.

Susan P. Watters
United States District Court Judge